In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1620

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WALID H. ABDULLA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 CR 734-1—**Joan B. Gottschall,** *Judge.*

ARGUED JANUARY 11, 2002—DECIDED JUNE 18, 2002

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted defendant Walid H. Abdulla of aggravated bank robbery, and the district court sentenced him to 97 months of imprisonment. Abdulla now appeals the denial of his motion to suppress and his enhanced sentence. We affirm.

## I. Background

In March 1998, Abdulla was indicted for aggravated bank robbery in violation of 18 U.S.C. § 2113(a) and (d) for a

bank robbery that occurred in 1995 in Wheaton, Illinois.[1] At the time of the indictment, Abdulla was living in Israel. In January 2000, the FBI received information that Abdulla was to arrive at the Los Angeles International Airport on a KLM Airlines flight from Jerusalem. On January 11, 2000, FBI Agents Catherine Moore and Patrick Conley went to the airport and apprehended Abdulla in the customs area shortly after his plane arrived. The agents then placed handcuffs on Abdulla and told him that he was under arrest. Immediately upon arresting Abdulla, but before advising him of his *Miranda* rights, Abdulla was asked:[2] "Do you know why you are being arrested?" He replied, "I robbed a bank, everyone knows I robbed a bank." During the next twenty minutes, the agents stood with Abdulla while customs agents searched his bags. During this time, Abdulla made the following statements: "Four years in the Holy Land can change a person. I came back to fix things." Further, he repeated, "I robbed a bank, everyone knows I robbed a bank." Neither of these statements was made in response to a question by Agents Moore or Conley, or by anyone else.

The agents took Abdulla to their car and drove him to the FBI office, which was approximately thirty minutes from the airport. At this point, Abdulla still had not been advised of his *Miranda* rights. During the car ride, Abdulla stated for the third time, "I robbed a bank, everyone knows I robbed a bank." This statement was not made in response to a question. Agent Conley then asked Abdulla what he meant by "everyone." Abdulla responded that he had been

---

[1] Abdulla was also charged with using a handgun during the commission of a crime of violence in violation of 18 U.S.C. § 924(c)(1). The jury acquitted him on this charge, which is irrelevant to the matters on appeal.

[2] Both agents recall being the one who asked the question.

named on the television show America's Most Wanted and that "everyone" meant everyone in Israel and the United States. In addition, Abdulla asked, "How much time do you think I'll get for the bank robbery—the gun I used wasn't real?" Again, no question prompted this statement, and, in fact, the statement was preceded by a couple of minutes of silence. After arriving at the FBI office, Abdulla was read his *Miranda* rights and made no further statements. Before trial, Abdulla moved to suppress all of the above statements.

At the suppression hearing, Agent Moore testified that in her four years with the FBI, she had arrested ten people. She testified that immediately upon arresting all ten of these people, she asked whether they knew why they were being arrested. Agent Moore explained that none of the suspects had ever made a confession in response to this question. Agent Conley testified that in his eight years with the FBI, he had arrested between 50 and 100 people. He further stated that immediately upon arresting most of these people, he asked the suspects if they knew why they were being arrested. Agent Conley also explained that in his experience, this question had never elicited an incriminating response. Finally, he testified that he asked Abdulla whether he knew why he was being arrested in order to ascertain Abdulla's understanding of the arrest process and of what was happening to him. Ultimately, the district court ruled that all of Abdulla's statements were admissible except the statement in which Abdulla explained the meaning of "everyone."

At Abdulla's trial, the government entered the following into evidence in addition to Abdulla's statements: A robber entered the First National Bank of Wheaton, pointed a gun at bank teller Catherine Simon, and ordered Simon and bank employee Laura Perna to fill a paper bag with money, which they did. The robber had been wearing a bandana around his face when he first entered the bank,

but had pulled it down in order to speak with the tellers, and thus had revealed his face. The robber then fled from the bank, at which point Perna went to a bank office across the street from the bank and informed Senior Vice President Ronald Jozwiak of the robbery. Jozwiak then left his office and saw a car with Illinois license plate number HDT 458 speed away from the bank's parking lot.

The FBI searched the Illinois Secretary of State databases and ascertained that the car with license plate HDT 458 was registered to Abdulla. Several days later, FBI agents went to Abdulla's residence in Orland Park, Illinois and saw Abdulla's car parked there. The agents then spoke with Abdulla's estranged wife Nadia Salem, who told them that she did not know of Abdulla's whereabouts. Salem then gave the FBI a photograph of Abdulla. Approximately one week after the robbery, a photospread was prepared from that photograph and was shown to the bank tellers present during the robbery. Three of the tellers (Perna, Diane Stewart, and Cathy Distazio) identified Abdulla in the photospread. In addition, during trial, these three tellers made in-court identifications of Abdulla as the person who had robbed the bank.

Ultimately, the jury convicted Abdulla of aggravated bank robbery, and the government moved to enhance his sentence pursuant to U.S.S.G. § 2B3.1(b)(2)(B), which directs the district court to enhance by six levels if "a firearm was otherwise used" during the commission of the robbery. The district court agreed with the government and enhanced Abdulla's sentence pursuant to that Guideline. The district court then sentenced Abdulla to 97 months of imprisonment.

## II.  Analysis

On appeal, Abdulla argues that the district court erred in denying his motion to suppress and that his sentencing

enhancement violated the rule set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

## A. Denial of Motion to Suppress

Abdulla made several incriminating statements shortly after being arrested. First, the agents asked him, "do you know why you are being arrested," to which he responded, "I robbed a bank, everyone knows I robbed a bank" (the "initial statement"). Further, without being prompted by any question, he repeated this statement on two other occasions—in the customs area of the airport and in the agents' car on the way to the FBI office (the "subsequent statements").[3] The district court denied his motion to suppress all of these statements, which were received into evidence at his trial. Abdulla makes two arguments with respect to the denial of his motion to suppress: First, he argues that the agents' question "do you know why you are being arrested?" was a custodial interrogation, and therefore, because he had not yet been advised of his *Miranda* rights, his initial statement should have been suppressed. Second, he argues that if the agents' question was a custodial interrogation, then his subsequent statements were "fruit of the poisonous tree" and therefore should also have been suppressed.

It is axiomatic that suspects must be advised of certain constitutional rights before being subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Accordingly, a sus-

---

[3]  In addition, Abdulla stated, "Four years in the Holy Land can change a person. I came back to fix things," and asked, "How much time do you think I'll get for the bank robbery—the gun I used wasn't real?" Neither of these statements was prompted by a question.

pect must be both "in custody" and subjected to "interrogation" before the *Miranda* warnings requirement is triggered. *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996). An individual is considered "in custody" when his movement is restrained to the degree comparable to a formal arrest. *See id.* Abdulla and the government agree that he was "in custody" when the agents told him he was under arrest and placed handcuffs on him at the airport, but disagree about whether the agents' question constituted an "interrogation." In *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnotes omitted), the Supreme Court stated that "interrogation" means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Under this court's interpretation of *Innis*, the test is "whether a reasonable objective observer would have believed that the . . . question[ ] claimed by [the defendant] to have been unlawful interrogation [was] in fact 'reasonably likely to elicit' an incriminating response." *United States v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997) (citations omitted).

It is unnecessary for us to address whether the agents' question in this case constitutes an interrogation because even if it were, we would still affirm because Abdulla's subsequent statements, which were identical to his response to this question, were admissible. As a preliminary matter, we note that if Abdulla's subsequent statements had been the only confessions in this case, then they would have been admissible because they were volunteered statements not made in response to any question posed by the agents. *See Andersen v. Thieret*, 903 F.2d 526, 531 (7th Cir. 1990) (holding that suspect's statement, "I stabbed her," which was not made in response to a question by the police, was a volunteered statement not subject to *Miranda*). Abdulla argues, however, that the subsequent statements

were "fruit of the poisonous tree" stemming from the initial *Miranda* violation, and therefore were inadmissible. However, the Supreme Court has rejected the application of the "fruit of the poisonous tree" doctrine to non-coercive *Miranda* violations. *See Oregon v. Elstad*, 470 U.S. 298, 308-18, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). In that case, the suspect made an initial incriminating statement before being advised of his *Miranda* rights, but an hour later, was advised of and waived his *Miranda* rights and executed a written confession. *See id.* at 301-02. The Court initially noted that *Miranda* requires the exclusion of "unwarned statements that are otherwise voluntary," *id.* at 307, but went on to examine to what extent such a technical violation of *Miranda* should have on the admissibility of subsequent statements. *See id.* at 308-09. With respect to this issue, the Court stated:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period . . . . [T]he admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309. The Court then held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. In determining whether the subsequent confessions were voluntary, a court "must examine the surrounding circumstances and the entire course of police conduct." *Id.*

Some courts have taken the view that *Elstad* signaled the end of any use of the fruit of the poisonous tree doctrine

based on a *Miranda* violation. *See*, *e.g.*, *United States v. DeSumma*, 272 F.3d 176, 180-81 (3d Cir. 2001). Other courts have stated that "*Elstad* does not wholly bar the door to excluding evidence derived from a *Miranda* violation."[4] *United States v. Byram*, 145 F.3d 405, 409 (1st Cir. 1998). We also note that the facts upon which *Elstad*'s holding was based differ from the facts in our case in that Abdulla did not waive his *Miranda* rights prior to making his subsequent statements. However, at least one other court has turned to *Elstad* "for guidance in determining the voluntariness of [the defendant's] second confession" when that second confession was not preceded by *Miranda* warnings. *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989). In doing so, the Ninth Circuit noted that the "fundamental import of the [Fifth Amendment] privilege while an individual is in custody is not whether he is allowed to *talk* to the police without the benefit of warnings and counsel, but whether he can be *interrogated*." *Id.* at 825 (*quoting Miranda*, 384 U.S. at 478) (emphasis in original). Therefore, without deciding whether the fruit of the poisonous tree doctrine can *ever* apply to a *Miranda* violation, we turn to whether *Elstad*'s underlying logic (a first confession that is voluntary, but that violates *Miranda*, will not bar the admission of a second voluntary confession) can apply to bar the use of the fruits doctrine in *this* case, as did the Ninth Circuit in *Medeiros*.

In determining whether Abdulla's first confession was coerced or whether it was voluntary, we note that a "confes-

---

[4] The First Circuit in *Byram* held that the fruit of the poisonous tree doctrine barred the admission of the defendant's second statement in part because "the original *Miranda* violation was not technical" in that the police induced the defendant to make incriminating statements by assuring him that he would not be "implicated in any of this." *Id.* at 409. This fact distinguishes that case from the case at bar.

sion is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). Further, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Id.* (quotation omitted). We have no problem concluding that even if Abdulla's initial statement violated *Miranda*, it was voluntary and not coerced. The agents merely asked him a simple question, and he gave an elaborated, volunteered answer. As the district court observed, "the agents had only been with Mr. Abdulla for a very short time [before his initial statement], there is no indication that any pressure was put on him."

Turning, therefore, to whether Abdulla's subsequent statements were voluntary despite the initial *Miranda* violation, we "examine the surrounding circumstances and the entire course of police conduct." *Elstad*, 470 U.S. at 318. In *Medeiros*, the police pulled over the defendant's car, which had matched the description of a car at the scene of a shooting. *See* 889 F.2d at 821. Without first advising the defendant of his *Miranda* rights, the police officer asked him from where he was coming. *See id.* The defendant replied that he had just been at a local bar and then spontaneously incriminated himself with respect to the shooting. *See id.* The police officer then arrested the defendant and took him to the police station. *See id.* After being booked, but before advising the defendant of his *Miranda* rights, two different police officers accompanied the defendant while the defendant went to receive medical treatment. *See id.* Prior to and during receiving treatment, and without any prompting from either officer, the defendant made more inculpatory statements about his involvement in the shooting. *See id.* At the defendant's trial for manslaughter, the district court granted the defendant's motion to suppress

his first statement, but allowed the subsequent statements to be admitted. *See id.* at 821-22 The defendant was ultimately convicted, and he appealed. *See id.* at 822.

With respect to the voluntariness of the defendant's subsequent statements, the Ninth Circuit held that they were voluntary, and thus were properly admitted despite the *Miranda* violation with respect to the first statement. *See id.* at 824-25. In support of its conclusion, the court placed great emphasis on the fact that the defendant made the subsequent statements spontaneously and not as the result of interrogation—"because [the defendant] chose to speak voluntarily, we conclude that his second statement is admissible." *Id.* at 825. Further, the court stated that although the subsequent statements were made only thirty minutes after the first statement was made, the fact that they were made at a different location supported their voluntariness. *See id.* In our case, as in *Medeiros*, Abdulla spontaneously made his subsequent statements, which were not made in response to a question. Further, he made his statements over a fifty-minute period in two locations—at the customs area in the airport and in the agents' car on the way to the FBI office. Therefore, because of the specific facts in this case, we conclude that Abdulla's subsequent statements were voluntary, and thus were properly admitted.

In any event, even if *all* of Abdulla's statements were improperly admitted, we would still affirm because their admission was harmless. *See Westbrook*, 125 F.3d at 1003 (applying harmless error analysis to *Miranda* violation). In this case, the other evidence pertaining to Abdulla's guilt was overwhelming—three bank employees identified him as the robber and his car was seen speeding away from the scene of the crime. Therefore, because he would have been convicted absent the admission of his statements, we affirm the denial of Abdulla's motion to suppress.

### B. *Apprendi*

Next, Abdulla argues that the district court's application of U.S.S.G. § 2B3.1(b)(2) violated the rule set forth in *Apprendi*, which states, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be . . . proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). Abdulla was convicted of aggravated bank robbery, which carries a statutory maximum penalty of twenty-five years' imprisonment. *See* 18 U.S.C. § 2113(d). In this case, Abdulla was sentenced to 97 months of imprisonment, which is well below the statutory maximum, and therefore, his *Apprendi* argument fails. *See, e.g.*, *United States v. Williams*, 238 F.3d 871, 876-77 (7th Cir. 2001) ("[W]hen a defendant is sentenced to a term of imprisonment within the statutory maximum for the crime of which he was convicted, *Apprendi* is beside the point.").

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Abdulla's motion to suppress and Abdulla's sentence.

A true Copy:

     Teste:

                                _____
                                *Clerk of the United States Court of*
                                    *Appeals for the Seventh Circuit*