# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID PETTIGREW,

Defendant-Appellant.

No. 05-2187

Before **TACHA**, Chief Circuit Judge, **SEYMOUR**, and **BRISCOE**, Circuit Judges.

## ORDER
Filed October 12, 2006

This matter is before us on Defendant-Appellant David Pettigrew's motion for panel rehearing or rehearing en banc. In *United States v. Pettigrew*, 455 F.3d 1164 (10th Cir. 2006) we affirmed Mr. Pettigrew's conviction and sentence, holding, in part, that a "finding of purpose, knowledge, or recklessness supports a conviction for assault resulting in serious bodily injury," *see id.* at 1175, and that an upward departure for the defendant's excessive recklessness in committing such an assault is a permissible grounds for a departure under United States Sentencing Guidelines Manual § 5K2.0, *see id.* at 1176. Mr. Pettigrew seeks

rehearing of this issue arguing that it conflicts with *Koon v. United States*, 518 U.S. 81, 96 (1996) and *United States v. Wolfe*, 435 F.3d 1289, 1296–97 (10th Cir. 2006) to the extent that a Guidelines departure is only warranted when the case falls outside the heartland that each offense Guideline carves out. We GRANT Mr. Pettigrew's petition for panel rehearing for the limited purpose of clarifying our discussion of this issue. The Opinion filed on July 27, 2006 is vacated and the attached revised opinion is substituted in its place.

Entered for the Court
ELISABETH A. SHUMAKER, Clerk


by:
Deputy Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID PETTIGREW,

Defendant-Appellant.

No. 05-2187

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D. Ct. No. 04-CR-888-LH)**

Michael A. Keefe, Assistant Federal Public Defender, Office of the Federal Public Defender for the District of New Mexico, Albuquerque, New Mexico, appearing for Appellant.

Laura Fashing, Assistant United States Attorney (David C. Iglesias, United States Attorney, with her on the brief), Office of the United States Attorney for the District of New Mexico, Albuquerque, New Mexico, appearing for Appellee.

Before **TACHA**, Chief Circuit Judge, **SEYMOUR**, and **BRISCOE**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

Following a jury trial, Defendant-Appellant David Pettigrew was convicted

of one count of involuntary manslaughter in violation of 18 U.S.C. §§ 1153 and

1112, two counts of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153 and 113(a)(6), and one count of assault by wounding in violation of 18 U.S.C. §§ 1153 and 113(a)(4). He was sentenced to 126 months' imprisonment. He now appeals both his conviction and sentence. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

In the morning hours of April 18, 2004, Mr. Pettigrew drove his truck to a friend's house and picked him up to go for a ride. As they drove around the area making various stops, the pair consumed twenty-four beers. Mr. Pettigrew then dropped his friend off at home at 4:30 in the afternoon. Although it is unclear what Mr. Pettigrew did after he dropped off this friend, at approximately 10:00 p.m. Mr. Pettigrew drove to Odell Yazzie's trailer, where Mr. Yazzie lived with his girlfriend and parents. Mr. Pettigrew asked Mr. Yazzie to go with him to buy more alcohol. Mr. Yazzie agreed to go and testified that he got into the passenger side of the truck even after noticing that Mr. Pettigrew was intoxicated. Although Mr. Pettigrew maintains that Mr. Yazzie drove Mr. Pettigrew's truck, and that Mr. Pettigrew was in the passenger's seat, the jury concluded that the evidence supported the Government's position that Mr. Pettigrew was in fact the driver.

The two men headed westbound on Highway 64, a four-lane highway with a posted speed limit of sixty miles per hour. Upon entering the highway, Mr. Pettigrew began swerving and other drivers blared their horns to warn him to

"drive right." After traveling a few miles, Mr. Pettigrew abruptly turned left across the dirt median and attempted to drive across the eastbound traffic toward a residence on the South side of the highway. As Mr. Pettigrew crossed the eastbound lanes, Mr. Yazzie noticed a van headed toward the passenger side of the truck. Mr. Yazzie yelled at Mr. Pettigrew to "step on it" but Mr. Pettigrew continued to drive slowly across the lanes. The van swerved to the right in an effort to avoid striking the passenger side of the truck. Consequently, the truck hit the back end of the driver's side of the van, causing it to flip three to four times. The van was occupied by the four members of the Beasley family—Carrie, Jason, and the couple's two young daughters. Carrie died in the accident and the other three Beasleys sustained moderate to serious injuries.

After the collision, Mr. Pettigrew's truck spun out and came to a stop for a few moments. Shortly thereafter, Mr. Pettigrew righted the vehicle and headed east along Highway 64. Mr. Yazzie tried to convince Mr. Pettigrew to stop the truck, but Mr. Pettigrew refused. Mr. Yazzie then grabbed the steering wheel, shifted the car into neutral, pushed on the brakes, and jumped out the passenger side window because the door would not open. Mr. Yazzie started walking back home and Mr. Pettigrew took off again.

Law enforcement officers were dispatched to the scene of the accident. They found Mr. Pettigrew's abandoned truck in a field next to the highway a mile and a half from the crash site. Deputy Anthony Ashcroft, an officer with the San

-3-

Juan County Sheriff's Department, noticed that the driver's side door was open and saw a set of footprints leading away from that door. He followed the footprints and eventually found Mr. Pettigrew crouching under a bush.

Because they were in Indian country, Deputy Ashcroft did not have jurisdiction to formally arrest Mr. Pettigrew, so the deputy detained him by placing him in handcuffs. When he did so he asked whether Mr. Pettigrew knew what he had done, to which Mr. Pettigrew responded, "Yeah, I fucked up my ride, now I got to get a new one." Deputy Ashcroft then told Mr. Pettigrew that he might have killed someone in the accident. Mr. Pettigrew responded by saying, "I still got to get a new ride" (hereinafter "first statement"). Deputy Ashcroft then escorted Mr. Pettigrew, who had a difficult time walking, back to the field where Mr. Pettigrew left his truck, and handed him over to Navajo Police Officer Ron Williams.

Officer Williams transported Mr. Pettigrew to the Shiprock detention center, where Mr. Pettigrew voluntarily submitted to a breath-alcohol test. During this time, an unidentified officer asked Mr. Pettigrew whether he had been drinking that night, to which Mr. Pettigrew responded, "yes, I was drinking" (hereinafter "second statement"). Then, while taking the blood-alcohol test, Mr. Pettigrew asked Officer Williams why he was arrested and what the charges against him were. Officer Williams informed Mr. Pettigrew that he had been arrested for driving while intoxicated and that he might have been involved in an

-4-

accident in which people were hurt. Mr. Pettigrew stated, "I saw it at the last minute. I hit it and took off" (hereinafter "third statement"). Mr. Pettigrew made all these statements prior to receiving *Miranda* warnings.[1]

The following day, Navajo Tribal Criminal Investigator Sammy Ahkeah attempted to interview Mr. Pettigrew about his involvement in the accident. Investigator Ahkeah informed Mr. Pettigrew of the charges he was facing and explained to him his *Miranda* rights. Thereafter, Mr. Pettigrew refused to provide a statement and invoked his right to counsel.

Mr. Pettigrew filed a pretrial motion to suppress all his statements made prior to receiving *Miranda* warnings. He argued that the first two statements were custodial interrogations that must be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966). He argued that the third statement was either a custodial interrogation or, in the alternative, was fruit of the poisonous tree—the poisonous tree being the first two statements obtained in violation of *Miranda*—and therefore must also be suppressed. The District Court granted the motion as to the first statement since it was the product of a custodial interrogation. The court did not rule on the admissibility of the second statement based on the

---

[1]Mr. Pettigrew also made incriminating statements to his cellmate, Wayne Benally, but he does not contend that they were obtained in violation of *Miranda* as Mr. Benally was not a law enforcement officer.

Government's assertion that it did not intend to use the admission at trial.[2]

Finally, the court held that the third statement was admissible because Mr. Pettigrew failed to show either that the statement was made in response to "express questioning or its functional equivalent," *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980), or that it was tainted by the original unlawful interrogation.

At trial, the Government sought to admit into evidence a photograph depicting all four members of the Beasley family, including Carrie Beasley while she was living. Mr. Pettigrew objected, arguing that it was not offered for any proper purpose and that it would be unduly prejudicial. The District Court stated that it would allow the photo to be admitted for the purpose of identification of the victims. Despite this ruling, the Government did not actually move the photo into evidence. Instead, the Government merely displayed the photo during its opening statement, used it to establish Ms. Beasley's identity through the testimony of Mr. Beasley, and displayed it again during its closing arguments. The jury convicted Mr. Pettigrew on all counts.

Subsequently, the probation office prepared a presentence report ("PSR"). It calculated the adjusted offense level for Mr. Pettigrew's involuntary manslaughter conviction as 22. *See* U.S. Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") § 2A1.4(a)(2)(B). The PSR also determined the

---

[2]In fact, Mr. Pettigrew elicited this statement on cross-examination of Officer Williams.

adjusted offense level for each of the two assaults resulting in serious bodily injury as 21. *See* U.S.S.G. § 2A2.2. The assault by wounding conviction, which is a Class B misdemeanor, is not governed by the Guidelines. *See* U.S.S.G. § 1B1.9. Under the grouping rules in § 3D1.4, the total adjusted offense level for the three felonies was 25. The PSR calculated Mr. Pettigrew's criminal history category as III, based upon a prior conviction for second-degree murder and because he committed the instant offenses less than two years after his release from custody and while still on supervised release. *See* U.S.S.G. § 4A1.1(a), (d), (e). Accordingly, the PSR determined that the applicable guidelines range was 70–87 months' imprisonment.[3] The PSR also noted possible bases existed for an upward departure: Mr. Pettigrew's excessively reckless behavior, *see* U.S.S.G. § 5K2.0, and Mr. Pettigrew's criminal history category substantially under-represents the seriousness of his criminal history and the likelihood that he will commit future crimes, *see* U.S.S.G. § 4A1.3(a)(1).

At the sentencing hearing, the District Court adopted the PSR's factual findings, including the adjusted offense level of 25 and criminal history category III. The court then departed upward two offense levels based on Mr. Pettigrew's excessive recklessness, and departed upward one criminal history category on the ground that Mr. Pettigrew's criminal history category substantially under-

_____

[3]The involuntary manslaughter conviction carries a statutory maximum sentence of 72 months' imprisonment. 18 U.S.C. § 1112.

represents the seriousness of his criminal history.  This resulted in a guidelines

range of 100–125 months' imprisonment.  The court imposed the statutory

maximum sentence for each of the two assaults, 120 months' imprisonment, to

run concurrently with his sentence for involuntary manslaughter, 72 months'

imprisonment.  The court also imposed six months' imprisonment for the

misdemeanor assault, to run consecutively with the other convictions.  This

resulted in a total sentence of 126 months.

Mr. Pettigrew raises four claims on appeal: (1) the District Court erred in

denying his motion to suppress the third statement; (2) the District Court abused

its discretion in admitting the photographic evidence at trial; (3) there was

insufficient evidence to support the assault convictions; and (4) his sentence is

unlawful.  We address each argument in turn.

## II.  THE CONVICTIONS

### A.  The Confession

When a party challenges a district court's ruling on a motion to suppress a

confession, we review its conclusions of law de novo and its factual findings for

clear error.  *United States v. Guerrero-Hernandez*, 95 F.3d 983, 986 (10th Cir.

1996).  We consider the evidence in the light most favorable to the district court's

determination.  *United States v. Lopez*, 437 F.3d 1059, 1062 (10th Cir. 2006).

Our de novo review includes "the ultimate issue of whether a statement was

voluntary, taking into account the totality of the circumstances surrounding the

confession." *Id.* Finally, it is the Government's burden to show, by a preponderance of the evidence, that a confession was voluntary. *Id.* at 1063.

As an initial matter, Mr. Pettigrew does not contest that his first two statements were voluntary, albeit made in violation of *Miranda*. Further, he no longer argues that his third statement was the product of a custodial interrogation. Accordingly, it is undisputed that if Mr. Pettigrew's third statement was the only statement he made, it would be admissible because it was volunteered and not made in response to any question posed by Officer Williams. *See Miranda*, 384 U.S. at 478 (explaining that "[t]he fundamental import of the privilege [against compelled self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated"); *see also United States v. Abdulla*, 294 F.3d 830, 835 (7th Cir. 2002) (volunteered statements made while in custody but not in response to questions posed by the police are not subject to the *Miranda* exclusionary rule); *Medeiros v. Shimoda*, 889 F.2d 819, 823–25 (9th Cir. 1989) (same). The essence of his argument is that his first two statements somehow rendered his third statement inadmissible either as "fruit of the poisonous tree" or, relatedly, because his first two statements rendered it involuntary. This issue—that is, whether a pre-warning confession, not itself a violation of *Miranda*, but obtained subsequent to two violations of *Miranda*, must be suppressed—is one of first impression for this Circuit.

_____1.    *Fruit of the Poisonous Tree*

The "fruit of the poisonous tree" doctrine is most often associated with violations of the Fourth Amendment's prohibition of unreasonable searches and seizures. *See Wong Sun v. United States*, 371 U.S. 471 (1963).  It prohibits at trial the use of evidence obtained directly or indirectly through an unlawful search or seizure. *Id.* at 484.  In that context, the exclusionary rule is necessary to "make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person." *Id*.  Stated another way, "[t]he rule is calculated to prevent, not to repair.  Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Brown v. Illinois*, 422 U.S. 590, 599–600 (1975).  Accordingly, the exclusionary rule as it applies to the Fourth Amendment is broad and witnesses and evidence (including confessions), no matter how probative, discovered only as a result of a Fourth Amendment violation, must be excluded from evidence. *Wong Sun*, 371 U.S. at 485–86; *Oregon v. Elstad*, 470 U.S. 298, 306 (1985).[4]

On the other hand, *Miranda*'s exclusionary rule serves the Fifth

_____

[4]That said, suppression of a confession following a Fourth Amendment violation is not absolute.  Even under the "broad" application of the "fruits" doctrine applied in Fourth Amendment cases, a confession may be properly admitted into evidence if it is voluntarily made (assuming no *Miranda* violation) and there is a "sufficient break in events to undermine the influence that the confession was caused by the Fourth Amendment violation." *Elstad*, 470 U.S. at 306; *Wong Sun*, 371 U.S. at 491.

Amendment. *Elstad*, 470 U.S. at 305–06. The Fifth Amendment's Self-Incrimination Clause bars the prosecution from using compelled testimony in its case-in-chief and is therefore primarily concerned with conduct at trial. *Id.* at 306–07. Prior to *Miranda*, the admissibility of a suspect's in-custody statements "was judged solely by whether they were 'voluntary' within the meaning of the Due Process Clause." *Id.* at 304 (citing *Haynes v. Washington*, 373 U.S. 503 (1963); *Chambers v. Florida*, 309 U.S. 227 (1940)). The rule in *Miranda* arose out of a concern that the "possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated." *United States v. Patane*, 542 U.S. 630, 639 (2004) (citing *Dickerson v. United States*, 530 U.S. 428, 434–35 (2000) and *Miranda*, 384 U.S. at 467). As such, a police officer's failure to administer *Miranda* warnings prior to a custodial interrogation "creates a presumption of compulsion," *Elstad*, 470 U.S. at 307, and the confession is inadmissible with no need for the "time-consuming and difficult enquiry into voluntariness," *Patane*, 542 U.S. at 646 (Souter, J., dissenting).

Unlike evidence obtained through a Fourth Amendment violation, however, the *Miranda* presumption does not require that the "fruits [of unlawfully obtained confessions] be discarded as inherently tainted." *Elstad*, 470 U.S. at 307. Indeed, the Supreme Court has rejected automatic application of the "fruits" doctrine to violations of the *Miranda* rule on several occasions. *See Missouri v. Seibert*, 542

U.S. 600, 619 (2004) (Kennedy, J., concurring) (stating that "the scope of the *Miranda* suppression remedy depends on a consideration" of whether the central concerns of *Miranda* are implicated as well as the objectives of the criminal justice system). For example, the prosecution is still permitted to use statements taken in violation of *Miranda* for impeachment purposes on cross-examination, *see Harris v. New York*, 401 U.S. 222 (1971); the prosecution may still introduce testimony of a third party whose whereabouts were determined through statements obtained in violation of *Miranda*, *see Michigan v. Tucker*, 417 U.S. 433 (1974); and the prosecution may still introduce physical evidence seized as a result of a *Miranda* violation, *see Patane*, 542 U.S. 630. Notably, the Court has also declined to apply the "fruits" doctrine to analyze the admissibility of a subsequent *warned* confession that followed an earlier violation of *Miranda*. *See Elstad*, 470 U.S. 298.

All the aforementioned cases recognize that in determining "how sweeping the judicially imposed consequences of a failure to administer *Miranda* warnings should be," consideration must be given to the dual goals of *Miranda*: the "general goal of deterring improper police conduct" and "the Fifth Amendment goal of assuring trustworthy evidence." *Id*. at 308 (internal citations and quotations omitted). The unwarned confession taken in violation of *Miranda* must be suppressed, but it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well. *Miranda*

itself recognized that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." 384 U.S. at 478.

Indeed, *Elstad* recognized that custodial statements made prior to the delivery of *Miranda* warnings do not necessitate exclusion of any subsequent confession. There, the suspect made his first incriminating statement voluntarily, albeit without first being given *Miranda* warnings. He was later advised of his rights, which he waived, and executed a written confession. The Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318.

We acknowledge that the facts upon which *Elstad* is based differ from those at issue here because unlike the petitioner in *Elstad*, Mr. Pettigrew was not warned prior to making the challenged confession. Nevertheless, we think that *Elstad*'s underpinnings control this case. Indeed, two of our sister circuits have held that statements made without *Miranda* warnings but not in response to police interrogation are admissible even though they followed an earlier voluntary statement made in violation of *Miranda*. *See Abdulla*, 294 F.3d at 835; *Medeiros*, 889 F.2d at 823–25. Both courts relied on *Elstad*'s conclusion that:

> It is an unwarranted extension of *Miranda* to hold that a simple
> failure to administer the warnings, unaccompanied by any actual
> coercion or other circumstances calculated to undermine the
> suspect's ability to exercise his free will, so taints the investigatory
> process that a subsequent voluntary and informed waiver is

-13-

ineffective for some indeterminate period. . . . [T]he admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

470 U.S. at 309. Today we join the Seventh and Ninth Circuits in holding that the admissibility of an unsolicited inculpatory statement, following a voluntary statement made in violation of *Miranda*, turns on whether the inculpatory statement was knowingly and voluntarily made. *Id*. at 309. In the absence of coercion or improper tactics, a broader rule would "undercut[] the twin rationales [of *Miranda's* exclusionary rule]—trustworthiness and deterrence." *Id*. at 308.

Mr. Pettigrew suggests, however, that the Supreme Court's recent decisions in *Patane* and *Siebert*, which discuss the "fruits" doctrine as it applies to *Miranda* violations, require a contrary holding. To this end, Mr. Pettigrew suggests that the four dissenters in *Patane* who believed that the "fruits" doctrine may extend to physical evidence obtained from a confession made in violation of *Miranda*, combined with Justice Kennedy's concurrence in *Siebert*—which provided the crucial fifth vote needed to find that *Miranda* warnings given mid-interrogation, in an effort to deliberately undermine *Miranda* itself, failed to render the subsequent confession voluntary—combine to favor application of the "fruits" doctrine to this case. To the contrary, we are convinced that these decisions support, rather than undermine, our holding today.

Importantly, the Court in *Siebert* recognized that the touchstone of a confession's admissibility is whether it is voluntarily given. 542 U.S. at 612 n.4.

-14-

As in *Elstad,* it explicitly declined to apply the "fruits" doctrine for confessions obtained after *Miranda* warnings were given. *Id.* Further, in his concurrence, Justice Kennedy notes that not every *Miranda* violation requires suppression of the evidence obtained thereafter. Rather, "[e]vidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Id.* at 618–19 (Kennedy, J., concurring). As noted above, admission of Mr. Pettigrew's third statement would not likely implicate *Miranda*'s central concern—introduction into evidence of a criminal defendant's compelled testimony—and the truth-finding mission of the criminal justice system is best served by its introduction.

2. *Voluntariness*

Having concluded that the "fruits" doctrine does not warrant automatic exclusion of Mr. Pettigrew's third statement, we must still determine whether it was voluntarily made.

Here, the only possible source of coercion that would have rendered Mr. Pettigrew's third statement involuntary is "the psychological impact of having let the cat out of the bag" with the prior statements. *Medeiros*, 889 F.2d at 823. This "cat out of the bag" theory was first recognized by the Supreme Court in *United States v. Bayer*, 331 U.S. 532 (1947). There, the Court explained:

> [A]fter an accused has once let the cat out of the bag by confessing,

-15-

no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

*Id.* at 540–41.

Mr. Pettigrew appears to argue that statements made after a *Miranda* violation and before *Miranda* warnings must generally be excluded as inherently coerced. But "endowing the psychological effects of *voluntary* unwarned admissions with constitutional implications" would, practically speaking, immunize a suspect from the consequences of any subsequent spontaneous remarks "even when the official coercion proscribed by the Fifth Amendment played no part in either . . . confession[]." *See Elstad*, 470 U.S. at 311. Such immunity would come at "at a high cost to legitimate law enforcement activity, while adding little desirable protection to the individual's interest in not being *compelled* to testify against himself." *Id.* at 312. Accordingly, a presumption of compulsion stemming from Mr. Pettigrew's prior admissions is not warranted.

Instead, we consider whether Mr. Pettigrew's third admission was voluntary based on a totality of the circumstances. *See Lopez*, 437 F.3d at 1063; *United States v. Perdue*, 8 F.3d 1455, 1467 (10th Cir. 1993) (admissibility of a subsequent confession depends on whether the "coercion surrounding the first

-16-

statement had been sufficiently dissipated so as to make the second statement voluntary"). The question we must resolve "is whether the confession is the product of an essentially free and unconstrained choice by its maker." *Lopez*, 437 F.3d at 1063 (quotations and alterations omitted). If so, it may be used against him. *Id.* If instead "his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.* To answer this question, we "examine the surrounding circumstances and the entire course of police conduct." *Elstad*, 470 U.S. at 318.

We conclude that Mr. Pettigrew's third statement was voluntary. He admits that his first two statements were voluntary. With regard to Mr. Pettigrew's first statement, Deputy Ashcroft merely asked him if he knew what he had done. When Mr. Pettigrew responded that he wrecked his car, Deputy Ashcroft told him that he may have hurt someone in the process. Mr. Pettigrew's second statement, though also taken in violation of *Miranda*, did not implicate him as the driver of the vehicle. He merely told an unidentified officer that he had been drinking that night, which was shortly confirmed by the breath-alcohol test. He made his third statement a half an hour after his first statement, in a different location, and to a different officer. Although he was in custody at the time, he was not handcuffed, and his statement was spontaneous and not in response to any questioning by Officer Williams. In fact, Officer Williams never interrogated Mr. Pettigrew and there is nothing to indicate that the police were attempting to use Mr. Pettigrew's

first two statements to obtain another incriminating statement. Even considering some lingering psychological effect of his first two statements, based on the totality of the circumstances, we conclude that the third statement was "an essentially free and unconstrained choice by its maker." *Lopez*, 437 F.3d at 1063; *see also Elstad*, 470 U.S. at 304–05 (stating that the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion"); *Abdulla*, 294 F.3d at 836–37 (reaching same conclusion on similar facts); *Medeiros*, 889 F.2d at 824–25 (same).

As to Mr. Pettigrew's contention that the District Court abused its discretion in failing to hold an evidentiary hearing on his motion to suppress, *see United States v. Glass*, 128 F.3d 1398, 1408–09 (10th Cir. 1997), we conclude that there was no such abuse. An evidentiary hearing may be appropriate when there are material facts in dispute relevant to the motion to suppress, *see id.*, but here, the Government conceded the facts as related by Mr. Pettigrew.

B.    Photographic Evidence

Mr. Pettigrew next challenges the display of the family photograph at trial. He argues that the District Court's admission of the photo was unfairly prejudicial and warrants a new trial. Fed. R. Evid. 403. The admission of photographs into evidence is reviewed for an abuse of discretion. *United States v. Treas-Wilson*, 3 F.3d 1406, 1410 (10th Cir. 1993). "[T]he district judge must balance the prejudicial effect of the photographs against their probative value, an exercise of

discretion that is rarely disturbed." *Id.*

A photograph of a victim while living is admissible to prove the identity of the victim. *See United States v. Joe*, 8 F.3d 1488, 1499 (10th Cir. 1993). The District Court acknowledged that a photo of the victim could stir up sympathy and emotions in the jurors, but concluded that any prejudice did not substantially outweigh its probative value since the Government had the burden to establish the identity of the victim. The court also cautioned the jury to "base your verdict solely upon the evidence without prejudice or sympathy," a sentiment echoed by the prosecutor during his closing argument.

We cannot say that the District Court abused its discretion in permitting the jury to see the photo during several phases of the trial. We are troubled by the Government's decision to display a photo of Carrie Beasley with the rest of her family and refer to it while saying that she did not make it home that night. But all four of the individuals depicted in the photo were victims in the crime. Three of them—including Carrie Beasley—did not appear in court. "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter . . . ." *United States v. Sides*, 944 F.2d 1554, 1563 (10th Cir. 1991) (quotation omitted). Accordingly, we will not disturb the District Court's balancing of these factors. That said, we must admonish the Government—the proffering of a photograph of the deceased victim, while living and posed with her family, as opposed to a photo depicting

-19-

only the decedent, "needlessly pushes the prosecutorial envelope, and could, if coupled with errors not present here, jeopardize a conviction." *United States v. Jones*, 24 Fed. App'x. 968, 975 (10th Cir. 2001).

C.    Sufficiency of the Evidence

Next, Mr. Pettigrew argues that the Government failed to present sufficient evidence of his intent to assault. We review claims of insufficient evidence de novo. *United States v. LaVallee*, 439 F.3d 670, 697 (10th Cir. 2006). "Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002)).

Assault is a general intent crime, and we recently held that "a finding of purpose, knowledge, or recklessness supports a conviction for assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6)."[5] *United States v. Zunie*, 444 F.3d 1230, 1235 (10th Cir. 2006) (citing Model Penal Code § 211.1(2)(a)). Stated another way, "[a] person is guilty of assault if he . . . purposely, knowingly or recklessly causes bodily injury to another." Model Penal Code § 211.1(2)(a).

The jury instructions provided as an essential element of all three assault

---

[5]We see no meaningful reason to treat assault under 18 U.S.C. § 113(a)(4), which is also a general intent crime, any differently.

-20-

charges that the jury had to find that Mr. Pettigrew acted "intentionally" in striking or in wounding the Beasleys. The instructions further explained that the intent element "may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind." Therefore, the jury was told that they "may infer . . . that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." This inference could be based on "all of the surrounding circumstances, such as the manner in which the defendant acts, the means used, the conduct, and any statements made by the defendant." Finally, "[t]he word 'knowingly' as that term has been used . . . in these instructions, means that the act was done voluntarily and intentionally, and not because of mistake or accident."

The jury in this case could reasonably infer that by driving while voluntarily intoxicated, Mr. Pettigrew "intended" the resulting "natural and probable consequences" of that action. *Cf. Zunie*, 444 F.3d at 1236 (10th Cir. 2006) (affirming conviction under 18 U.S.C. § 113(a)(6) where drunk-driving defendant injured child in crash); *United States v. Ashley*, 255 F.3d 907 (8th Cir.2001) (same); *United States v. Loera*, 923 F.2d 725, 730 (9th Cir. 1991) (same). Evidence at trial demonstrated that Mr. Pettigrew drove to Mr. Yazzie's house and asked if he would accompany him to buy more alcohol; that Mr. Pettigrew got in the driver's seat and drove to Highway 64; that he drove in a manner that caused other drivers to honk at him, warning him of the danger he

-21-

posed; that he crossed the dirt median and the eastbound lanes of Highway 64; and that he continued to cross the lanes slowly despite Mr. Yazzie's warning to "speed it up." Taking this evidence in the light most favorable to the Government, there was sufficient evidence to support the convictions.

## III. THE SENTENCE

Mr. Pettigrew argues that the District Court misapplied the Guidelines in departing upwards. "Even after *Booker*, 'when reviewing a district court's application of the Sentencing Guidelines, we review legal questions de novo and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts.'" *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006) (quoting *United States v. Martinez*, 418 F.3d 1130, 1133 (10th Cir. 2005)). We review a District Court's upward departure under a "unitary abuse of discretion standard," which "involves review to determine that the district court's discretion was not guided by erroneous legal conclusions." *Id.* (alteration and quotation omitted). Finally, we review the ultimate sentence imposed for reasonableness. *United States v. Mares*, 441 F.3d 1152, 1159 (10th Cir. 2006).

Mr. Pettigrew argues that the District Court erred in departing upward on the grounds that Mr. Pettigrew's conduct was excessively reckless and because his criminal history category was substantially underrepresented by his criminal history score. As to Mr. Pettigrew's first contention, the Guidelines

permit departure under § 5K2.0 based on circumstances present to a degree not adequately taken into account elsewhere in the Guidelines. Mr. Pettigrew contends, however, that a departure for excessive recklessness is not permitted in this instance because acting with excessive recklessness constitutes a lesser degree of culpability than that required to commit an assault.[6] To the contrary, as noted above assault is a general intent crime and "a finding of purpose, knowledge, or recklessness supports a conviction for assault resulting in serious bodily injury." *Zunie*, 444 F.3d at 1235.

Mr. Pettigrew argues, however, that because § 2A2.2, the Guideline relevant to his assault conviction, necessarily takes into consideration intentional conduct (a more culpable mental state than recklessness), a defendant's "excessive recklessness" can never be outside the heartland of assault cases. *See Koon v. United States*, 518 U.S. 81, 96 (1996) (departures are warranted when circumstances exist that "take the case outside of the Guideline's heartland"); *United States v. Wolfe*, 435 F.3d 1289, 1296–97 (10th Cir. 2006) (same). "[W]hether the facts of a particular case are sufficient to take this case outside the guidelines' heartland of similar cases, is a factual inquiry which this court reviews for an abuse of discretion." *Wolfe*, 435 F.3d at 1298.

---

[6]Mr. Pettigrew correctly notes that the upward departure could not be applied to the involuntary manslaughter conviction because the applicable sentencing range for that count, prior to any departure, was 70–72 months, and the applicable statutory maximum was 72 months.

The typical assault case covered by § 2A2.2 involves a single victim. *United States v. Moore*, 997 F.2d 30, 36–37 (5th Cir. 1993). Even an intentional assault with respect to the victim may be committed in an excessively reckless manner with regard to others. Indeed, courts have acknowledged that endangering third parties is a valid basis for departure in similar circumstances. *See, e.g., Wolfe*, 435 F.3d at 1300 (observing that an upward departure for excessive reckless may be warranted when the defendant's conduct poses a threat to public safety); *United States v. Hardy*, 99 F.3d 1242, 1249–52 (1st Cir. 1996) (rejecting a challenge to a sentencing court's upward departure based on the unusual level of risk to others associated with defendant's illegal possession of firearms under § 5K2.0); *Moore*, 997 F.2d at 37 (holding that a court may depart upward based upon a third party's injury in an assault case). Section 2A2.2 does not take into consideration the risks posed to third parties by a defendant's assaultive conduct. *Moore*, 997 F.2d at 37. Accordingly, a defendant's excessive recklessness in committing an assault may take the case outside the heartland of assault cases.

Here, the District Court determined that Mr. Pettigrew's conduct—driving while intoxicated with a blood-alcohol level of approximately three times the legal limit and crossing the highway against traffic—showed "severe" disregard for human life, especially in light of Mr. Pettigrew's history of alcohol abuse resulting in the death of at least one other person. In other words, Mr. Pettigrew

was "on notice of his propensity to drink . . . and the dangerousness of such conduct." *United States v. Jones*, 332 F.3d 1294, 1302 (10th Cir. 2003) (affirming five-level upward departure for excessive recklessness based on defendant's blood-alcohol level at twice the legal limit and his five prior convictions for drunk driving) (quotations and alterations omitted). Based on the foregoing, we cannot say that the District Court abused its discretion in concluding that Mr. Pettigrew acted excessively recklessly or in departing upward two offense levels based on that conduct. *See id.* at 1303 (the district court may use a prior conviction to calculate both criminal history level and offense level).

Next, Mr. Pettigrew argues that the criminal history departure was impermissible. A district court may depart upward "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). The District Court found that a criminal history category of III substantially under-represents Mr. Pettigrew's criminal history because one of his prior convictions was for second-degree murder and because he had several convictions in tribal court which were not taken into account at all.

Here, the District Court judge had uniquely reliable information that indicated that Mr. Pettigrew's criminal history category substantially underrepresented the seriousness of his prior crimes—he was the one who

sentenced Mr. Pettigrew in 1997 for second-degree murder. Nonetheless, Mr. Pettigrew argues that this is not a permissible basis for departure because the conviction was already taken into account in determining his criminal history and because it is not one of the listed bases for departure in § 4A1.3(a)(2). As an initial matter, nothing in § 4A1.3(a)(2) suggests that the grounds listed for departure are the only permissible bases for departure for an inadequately represented criminal history category. *See, e.g.*, *United States v. Lawrence*, 349 F.3d 724 (4th Cir. 2003) (approving of a departure not contemplated by § 4A1.3(a)(2)); *United States v. Rivera*, 879 F.2d 1247, 1255 (5th Cir. 1989) *overruled on other grounds by United States v. Cotton*, 535 U.S. 625 (2002) (same). Moreover, a defendant receives three criminal history points for any conviction resulting in sentence of imprisonment of one year and one month or longer. U.S.S.G. § 4A1.1(a). The score does not further distinguish between the seriousness of offenses. Thus, some crimes, like murder, are underrepresented by the inflexible three-point addition. *United States v. Yahnke*, 395 F.3d 823, 825 (8th Cir. 2005); *Rivera*, 879 F.2d at 1255. We are further guided on this matter by the fact that post-*Booker*, two of the factors that a court must take into consideration in fashioning an appropriate sentence are "the history and characteristics of the defendant" and the "need . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1), (2)(C). We therefore conclude that this was a permissible basis for departure.

The District Court also found that an upward departure was warranted based upon Mr. Pettigrew's prior convictions in tribal court. The Guidelines expressly contemplate a departure on this basis. *See* U.S.S.G. § 4A1.3(a)(2)(A) (stating that a departure may be warranted based upon "[p]rior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal offenses)"). Mr. Pettigrew had several tribal convictions including convictions for disorderly conduct, aggravated assault, endangering the welfare of a minor, aggravated battery, and criminal damage. He correctly points out that some of these convictions were more than ten years old, and therefore would not be included in the criminal history calculation if they were state or federal court convictions. *See* U.S.S.G. § 4A1.2(e)(2). Nevertheless, independent of the Tribal Court convictions, his criminal record reveals an adequate basis for the one-criminal-history-point departure. We therefore decline to reach all the factors the District Court considered in finding this departure warranted. *See United States v. Harlan*, 368 F.3d 870, 876 (8th Cir. 2004). We conclude that the District Court's departure was permissible and that the degree of departure—one criminal history category—was reasonable.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM Mr. Pettigrew's convictions and sentence.